UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

| | | |
|---|---|---|
| CARRIE McNEAL, | : | Case No. 3:11-cv-161 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND NOT
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND REVERSED;
AND (2) JUDGMENT SHALL BE ENTERED IN FAVOR OF PLAINTIFF
AND THE MATTER REMANDED TO THE SOCIAL SECURITY
ADMINISTRATION FOR AN IMMEDIATE AWARD OF BENEFITS;
AND (3) THIS CASE SHALL BE CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to disability insurance benefits ("DIB") and Supplemental Security

Income ("SSI").  (*See* Administrative Transcript ("Tr.") (Tr. 19-30; 845-859) (ALJ's

decision)).

**I.**

Plaintiff applied for DIB and SSI on October 20, 2000, alleging an onset date of

August 7, 2000.  (Tr. 64, 86, 503).  Plaintiff alleged disability due to chronic neck pain,

pain disorder, and bipolar disorder with depression and anxiety.  (Tr. at 850).  Plaintiff's

claims were denied initially and upon reconsideration.  (Tr. 43, 50, 507, 514).

However, the Appeals Council remanded the case back to the same ALJ (Tr. 385-

88), who entered a partially favorable decision on September 9, 2004, finding that
Plaintiff was disabled from February 1, 2001 to December 1, 2003. (Tr. 16-30).
Specifically, the ALJ found that Plaintiff's mental impairments met Listing 12.04.[1] The
ALJ did not find that Plaintiff was disabled before or after this period, believing that
Plaintiff could return to her past relevant work as a repair order clerk. (Tr. 16-30).

The Appeals Council denied Plaintiff's request for review of the unfavorable
aspects of the decision, and Plaintiff brought an action in federal court. (Tr. 8-10). The
parties stipulated and petitioned the District Court for remand in June 2008, agreeing that
the Commissioner or ALJ would assess the period prior to February 1, 2001 and after
December 1, 2003, to give further consideration to Dr. Kalfas's opinion regarding
Plaintiff's cervical spine limitations and how Plaintiff's cervical spine limitations
impacted her overall residual functional capacity, if at all. (Tr. 865-67).

On remand, a third hearing was held before a new ALJ, who issued a partially
favorable decision on October 19, 2009 that Plaintiff was disabled from February 1, 2001
to December 1, 2003 because her mental impairments met Listing 12.04. (Tr. 845-59).
The ALJ did not find that Plaintiff was disabled before or after this period; however, he
did not feel that Plaintiff could return to any of her past relevant work. (Tr. 856).
Additionally, the ALJ found that the medical vocational guidelines directed a finding of

---

[1]    Listing 12.04 (affective disorders) requires that Plaintiff also exhibit either marked
restriction in activities of daily living, or difficulties in maintaining cooperation, persistence, or
pace, or repeated episodes of decompensation.

"disabled" as of October 18, 2007 when Plaintiff attained the age of 55.  (Tr. 857).
The Appeals Council denied Plaintiff's request for review, explaining that the ALJ's
decision complied with the remand order.  (Tr. 830-33).  Therefore, the ALJ's October
19, 2009 decision is the final decision of the Commissioner.

Plaintiff was born on October 18, 1952 and is 59 years old.  Plaintiff has a high
school education with some college credits.  (Tr. 92).  She worked in the past as a car
sales representative, warehouse supervisor, material coordinator, and a repair order
coordinator.  (Tr. 99).

The ALJ's "Findings," which represent the rationale of his decision, were as
follows on October 19, 2009:

1.  The claimant met the insured status requirements of the Social Security Act
through December 31, 2004.

2.  The claimant has not engaged in substantial gainful activity since August 7,
2000, the alleged disability onset date (20 CFR 404.1520(b), 404.1571 *et
seq.*, 416.920(b), and 416.971 *et seq.*).

3.  The claimant has the following impairments which are severe for Social
Security purposes: (1) chronic neck pain with residuals of a surgical fusion;
(2) bipolar disorder with depression and anxiety; (3) a history of a pain
disorder; and (4) a history of substance abuse (20 CFR 404.1520 (c) and
416.920 (c)).

4.  During a closed period from August 7, 2000, to January 31, 2001, the
claimant's bipolar disorder and history of substance abuse equaled in
severity the requirements of sections 12.04 and 12.09 of Appendix I (and
the claimant was "disabled" as defined in the Act during that closed period).
With respect to the period prior to February 1, 2001, and since December 1,
2003, the claimant does not have an impairment or combination of
impairments that meets or medically equals one of the listed impairments in
20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,

-3-

404.1526, 416.920(d), 416.925, and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that, with respect to the period prior to February 1, 2001, and the period since December 1, 2003, the claimant has the residual functional capacity ("RFC")[2] to do a limited range of light work subject to: (1) lifting no more than 10 pounds; (2) no work above shoulder level; (3) occasional stooping or crouching; (4) occasional climbing of stairs and no climbing of ropes, ladders, or scaffolds; (5) no exposure to hazards; (6) low stress jobs with no production quotas and no exposure to the general public; and (7) no requirement to maintain concentration on a single task for longer than 15 minutes at a time.  For the period since December 1, 2003, the claimant's increased mental capacity represented medical improvement related to the ability to work.  By definition, light work ordinarily requires the capacity to lift 10 pounds frequently and 20 pound occasionally, and to engage in a good deal of sitting, standing, or walking.

6.      The claimant is not capable of performing her past relevant work as an order clerk, warehouse traffic coordinator, warehouse supervisor, or automobile salesperson.

7.      The claimant was born on October 18, 1952, and was 47 years old and defined as a "younger individual" at the alleged disability onset date of August 7, 2000.  Upon her attainment of age 50 in October 2002, she was classified as an individual who is "closely approaching advanced age." Upon her attainment of age 55 on October 18, 2007, she is classified as an individual of "advanced age" (20 CFR 404.1563 and 416.963).

8.      The claimant has a high school education and is able to communicate in English, but there is no evidence that her education provides for direct entry into skilled work (20 CFR 404.1564 and 416.964).

9.      The testimony of the vocational expert that the claimant's acquired work skills from skilled past relevant work did not transfer to other skilled or semiskilled jobs was not challenged; therefore, it is found that the claimant has no transferable job skills (*see* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

_____

[2]    The Agency defines RFC as "the most you can still do despite your limitations."  20 C.F.R. § 404.1545(a)(1).

10. Considering her age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that claimant could have performed with respect to the period prior to February 1, 2001, and the period from December 2, 2003, until October 18, 2007 (20 CFR 404.1560(c), 404.1566, 416.960 (c), and 416.966). However, as of October 18, 2007, the medical-vocational guidelines of Appendix 2 direct a finding that she is "disabled."

(Tr. 849-857).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations before February 1, 2001 or after December 1, 2003, and was therefore not entitled to DIB or SSI. (Tr. 858-859).

On appeal, Plaintiff argues that: (1) the ALJ erred by finding that Plaintiff's disability ended on December 1, 2003 when the record does not contain evidence that Plaintiff's condition medically improved after this date; and (2) the ALJ erred by failing to grant proper weight to the opinion of Plaintiff's treating psychiatrist, Dr. Patwa. The Court will address each argument in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that

finding must be affirmed, even if substantial evidence also exists in the record upon

which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal
> merely because substantial evidence exists in the record to
> support a different conclusion. The substantial evidence
> standard presupposes that there is a "zone of choice" within
> which the Commissioner may proceed without interference
> from the courts. If the Commissioner's decision is
> supported by substantial evidence, a reviewing court must
> affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is

entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present

sufficient evidence to show that, during the relevant time period, she suffered an

impairment, or combination of impairments, expected to last at least twelve months, that

left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:[3]

In November 2000 Plaintiff was sent to Dr. Boeger for a psychological evaluation.

(Tr. 162-68). Plaintiff complained primarily of pain and became tearful when she spoke

about her condition worsening. (Tr. 165). She complained of memory problems related

---

[3]    Although Plaintiff's physical limitations were the focus of the district court's remand order (Tr. 865-57), on appeal Plaintiff does not contest the ALJ's evaluation of her physical limitations. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (argument not presented to the district court was deemed waived). Therefore, this Court will only address Plaintiff's mental illness.

to her medications. She had difficulty performing serial sevens[4] and could only recall two out of four objects after five minutes. (Tr. 166). Dr. Boerger diagnosed depressive disorder. He felt Plaintiff would be mildly to moderately impaired in her ability to relate to others due to her low frustration tolerance associated with pain and depression. He felt that her ability to understand and follow directions was moderately impaired and her ability to maintain attention to perform simple repetitive tasks would be moderately to severely impaired. (Tr. 167).

Plaintiff first sought treatment from psychiatrist Dr. Patwa on July 30, 2001, reporting suicidal thoughts and auditory and visual hallucinations. (Tr. 290). She was given several psychotropic medications, which helped her symptoms. (Tr. 289, 293). However, Plaintiff was hospitalized for several days in August 2001. (Tr. 248-68). She reported that she was severely depressed; heard very scary voices; saw little children being abused; could not breathe; and felt like she was going crazy. (Tr. 252). She had suicidal ideation, suicidal intent, and a plan to commit suicide with an overdose. (Tr. 252).

In December 2001, Plaintiff was fearful, flighty, circumstantial, and paranoid. (Tr. 280). However, in April 2002, Plaintiff began to feel somewhat better to the point that she went off her medications, culminating in another hospitalization in April 2002 for

---

[4]    "Serial sevens" refers to counting down from one hundred by sevens, and is a clinical test used to test mental function. On its own, the inability to perform "serial sevens" is not diagnostic of any particular disorder or impairment, but is generally used as a quick and easy test of concentration and memory.

psychiatric symptoms. (Tr. 321-24). The doctor noted on admission that she was so paranoid that she would not talk about the voices she was hearing, her rage, or suicidal thoughts because "she was convinced that if she would tell anybody . . . she would never be discharged from the hospital." (Tr. 321). She was discharged after approximately eight days with medication adjustment and "obvious improvement." (Tr. 323).

On May 20, 2002, Dr. Patwa completed a narrative report and Psychiatric Review Technique Form stating:

> Mrs. McNeal's mood continues to be depressed with frequent
> unprovoked crying spells but she does not have any suicidal ideation,
> intent or plan at this time. Mrs. McNeal is still anxious and easily
> agitated but she is trying to deal with these issues by increased
> medication compliance, participation in a healthy heart diet program
> with her mother, and continued exercise as tolerated by her physical
> condition. Mrs. McNeal's current hygiene is only fair and she is
> easily irritated by almost everyone. Even her husband and family, by
> her own report, are trying to be as low-key as possible around her.

(Tr. 294). Dr. Patwa felt that Plaintiff had marked restrictions in activities of daily living, social functioning, and concentration. He also felt that she had experienced three episodes of decompensation. (Tr. 303).

In September 2003, Dr. Patwa noted that, despite compliance with medication and elimination of narcotic pain medication, Plaintiff was still spending some days in bed. He stated:

> She has no energy, no ambition, and no motivation. She has episodes
> of crying uncontrollably and not knowing why she has been crying.
> The patient has been very depressed, thinks about suicide, and cries
> uncontrollably. The patient said she has more bad days than good
> days, and no matter what she does, how hard she tried, they continue

to be there.

(Tr. 473).

In a report dated December 16, 2003, Dr. Patwa stated that Plaintiff had been compliant with treatment and had not missed any appointments; however her medication continued to be adjusted frequently. He opined:

> She will do well for brief periods but has had extended periods of depression, crying spells, hallucinations, and hypomania to the point where she is not considered able to perform any substantial gainful employment. Her bipolar disorder is treatable but not curable and this had been and is expected to continue to be an ongoing process.

(Tr. 411). Dr. Patwa opined that Plaintiff would be unable to sustain the mental demands of work on a regular continuing bases due to her emotional distress and pain. (Tr. 415-20). He noted, for example, that Plaintiff "is rarely stable for long periods of time. Although she has not required frequent hospitalizations, she is often in crisis and requires much support." (Tr. 416). Dr. Patwa concluded that Plaintiff continued to be disabled and "is likely to continue to be for the foreseeable future." (Tr. 411).

In November 2004, Dr. Patwa noted that Plaintiff was having difficulty sleeping and felt anxious and depressed, but he attributed the symptoms to her "pathological" family dynamics. (Tr. 983). He noted that Plaintiff was worn out and drained from playing "the role of mother to [the] entire family" and giving them money. (Tr. 983).

In February 2005, Plaintiff was stressed by her sister's suicide attempt. (Tr. 981). In a treatment note dated February 17, 2005, Plaintiff remained anxious and "depression persists." (Tr. 981). On mental status exam, she was alert and oriented; however she was

also anxious and "rather paranoid and jumpy." It was noted that she has difficulty focusing/concentrating and that the "examiner has to explain things several times." On April 15, 2005, Plaintiff's mental status was described as "distressed" and it was noted that she talked non-stop for a whole hour and cried for an hour. (Tr. 980).

In May 2005, Plaintiff came into Dr. Patwa's office crying about "her family's severe pathology" and the strain on her marriage resulting from her continued involvement with her family. (Tr. 979). Dr. Patwa noted that "[t]he story goes on and on and on. The dysfunction in the family persists. Plaintiff has been compliant with the medication, but she has been severely depressed. Every time she has contacted any one in the family, she becomes bedridden, withdrawn, secluded." (Tr. 979). Dr. Patwa believed that adjusting Plaintiff's medications "would not deal with the issue." (Tr. 979).

In June 2005, Dr. Patwa noted that Plaintiff was still feeling very depressed and had a full-blown panic attack due to her continued involvement "in taking care of her mother and sister and everybody," an analysis with which Plaintiff's husband agreed. (Tr. 978). He noted that Plaintiff "continued to cry and talk about multiple topics, but the theme of all the topics is that she stays busy and involved in taking care of her family members." (Tr. 978). He again emphasized that Plaintiff's "pharmocotherapy has been the same, and the issue is not pharmacotherapy. Now it is more of an issue of her inability to say no . . . . We discussed this issue again and again." (Tr. 978).

Plaintiff was hospitalized again in July 2005 due to depression, suicidality, hearing voices, and feeling overwhelmed with anxiety. (Tr. 924-40). Some of Plaintiff's

medications were increased and others were discontinued. (Tr. 924). It was noted that "there has not been sufficient time for the Zyprexa to be washed out and this honeymoon period may not last for long." (*Id.*)

Plaintiff returned to see Dr. Patwa on August 25, 2005, at which time she reported that she continued to take the medication she received at the hospital, although she also reported that she had been crying uncontrollably. (Tr. 977). Dr. Patwa noted that she remained rather anxious, depressed, guilt ridden, and had difficulty focusing and concentrating. On mental status exam, Plaintiff was flighty, circumstantial, verbose, anxious, and "had been crying." In October 2005, Plaintiff reported "losing much sleep," as well as hearing voices and having visual hallucinations. (Tr. 976). On mental status exam, she was alert and logical; however, her speech was somewhat rapid and pressured with mild euphoria.

Plaintiff mentioned that she could not afford mental health treatment in April 2006, so Dr. Patwa's office gave her medication samples. (Tr. 969). In May 2006, Dr. Patwa advised Plaintiff "to not take over as a therapist and not continue to be a parental figure to her own parents and siblings and the rest of the world." (Tr. 964). He noted that, ever since Plaintiff cut contact with her mother, "she and her husband [got] along much better," and she slept well. (Tr. 964). Notably, he observed that, with her dysfunctional family out of the picture, her medication did "seem to keep her depression, anxiety, [and] panic attacks under reasonable control." (Tr. 964).

Plaintiff continued to visit her physician, Dr. Sugumaran, during 2007 and 2008.

Dr. Sugumaran's treatment notes from this period indicated that Plaintiff exhibited normal orientation, memory, judgment and insight, mood and affect.  (Tr. 910, 912, 916).

When Plaintiff again sought care from Dr. Patwa two years later in May 2008, she again reported having "trouble, chaos, mess" with her family dynamics, and Dr. Patwa again noted that Plaintiff was "practically functioning as her [mother's] mother," despite repeated warnings from her therapists to stay away from her manipulative mother.  (Tr. 966).  On mental status examination, Plaintiff was hyper-alert and was crying uncontrollably.  She reported auditory and visual hallucinations.  (Tr. 968).  Plaintiff was not taking any psychotropic medications.  (Tr. 965).  After being placed on psychotropic medications, Plaintiff reported feeling a "lot better."  (Tr. 948, 968).

On mental status examinations between April and September 2008, Plaintiff's mood was depressed, anxious, and occasionally manic.  Her thought process was sometimes goal-directed but more frequently tangential.  (Tr. 958-63).

**Medical Expert's Relevant Testimony**

Clinical psychologist Dr. Buban testified at Plaintiff's July 2004 hearing.  In the absence of longitudinal documentation, Dr. Buban inferred that Plaintiff's condition likely deteriorated during a period of four to six months leading up to Plaintiff's August 2001 hospitalization.  (Tr. 774, 778, 781).  Dr. Buban characterized Plaintiff as psychiatrically "very stable" by the end of 2003.  (Tr. 779).  Dr. Buban explained that, after the August 2001 hospitalization, she would look at the following four to six months to determine whether Plaintiff was stabilized.  (Tr. 781).  Dr. Buban noted that Plaintiff's

treatment, relatively speaking, was not intense. (Tr. 781). Dr. Buban also explained that by 2002, Plaintiff's medications had achieved good control; by then, physicians had coordinated her medications to avoid medication interactions. (Tr. 775-77). Dr. Buban also attached significance to the fact that Plaintiff was taken off Methadone around December 2003, because eliminating a strong medication such as Methadone would be expected to improve the clarity of Plaintiff's thinking. (Tr. 775, 778, 787).

**The ALJ's Decision**

The ALJ found that, beginning February 1, 2001 and ending December 1, 2003, Plaintiff was disabled because her mental impairment equaled in severity the requirements of Listings 12.04 and 12.09. (Tr. 853, 858). With respect to the period prior to February 1, 2001 and since December 1, 2003, the ALJ found that Plaintiff had the RFC to do a limited range of light work subject to the following additional limitations: 1) lifting no more than 10 pounds; 2) no work above shoulder level; 3) no more than occasional stooping or crouching; 4) no more than occasional climbing of stairs and no climbing of ropes, ladders, or scaffolds; 5) no exposure to hazards; 6) only low stress work with no production quotas and no exposure to the general public; and 7) no requirement to maintain concentration on a single task for longer than 15 minutes at a time. (Tr. 854). Based on the testimony of the vocational expert, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed with respect to the period prior to February 1, 2001 and the period from December 1, 2003 until October 18, 2007. (Tr. 857). However, the ALJ found that,

as of Plaintiff's 55th birthday on October 18, 2007, the Medical-Vocational Guidelines directed a finding that Plaintiff was disabled.  (Tr. 857).

**B.**

First, Plaintiff claims that the ALJ erred by finding that her disability ended on December 1, 2003, when the record does not contain evidence that her condition medically improved after this date.

The ALJ concluded that the records pertaining to Plaintiff's psychological impairments demonstrated "improved mental stability with treatment by December 1, 2003." (Tr. 854).  Specifically, The ALJ claims that treatment notes from December 2003 forward frequently indicated that Plaintiff exhibited normal speech and thought process, fair or good concentration and functioning, reduced or no hallucinations, no suicidal intent, and no delusions; some of these notes also indicated that Plaintiff's mood was normal.  (Tr. 442-43, 448-51, 455-57, 461-64, 467, 470, 970, 973-75, 985, 988, 910, 912, 916, 948, 958-61, 963, 989, 993, 994-1004).  The ALJ stated that Plaintiff's mental health appeared to stabilize on medication by December 2003, per Dr. Buban's testimony and that "the records submitted since the last hearing decision fully support the above conclusions regarding the claimant's mental abilities."  (Tr. 853).  After December 1, 2003 (and before February 1, 2001), the ALJ found that a mental restriction to a low stress work environment would essentially be in accordance with the recommendations set forth by Dr. Buban.

Under the regulations, Plaintiff's disability benefits could be terminated if there

-14-

had been any medical improvement, if the improvement is related to the ability to work, and if the claimant is currently able to engage in substantial gainful activity.  20 C.F.R. § 404.1594(a).  "Medical improvement" is "any decrease in the medical severity of . . . impairment(s) [that] was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled."  20 C.F.R. §404.1594(b)(1).  A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)."  20 C.F.R. § 404.1594(b)(1).

The burden of proof in establishing a medical improvement lies with the Commissioner.  *Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 361 (6th Cir. 2001).  For the ALJ's finding to be affirmed, there must be substantial evidence showing that plaintiff experienced a medical improvement such that she would be able to engage in substantial gainful activity.

There is no evidence to support a finding that Plaintiff's psychological impairments decreased in severity since December 1, 2003.  Moreover, the ALJ fails to clearly articulate support for his opinion.  The ALJ stated:

> Progress notes of Dr. Patwa, which span the period from May 2004 until August 2009, show that the claimant continued to experience mood swings with depression, insomnia, anxiety, and feelings of panic, seemingly related to family problems . . . The claimant reportedly could be flighty and circumstantial.  Auditory hallucinations were reported by the claimant.  Some adjustments of her medication were made.  However, progress notes generally indicate that she functioned at a fair-to-good level with treatment.  (Tr. 852).

The ALJ's review of Plaintiff's treatment record is cursory and inaccurate.

Specifically, stating that "progress notes generally indicate that [Plaintiff] functioned at a fair-to-food level" fails to satisfy the regulations regarding a showing of medical improvement. Additionally, the ALJ erroneously relied on Dr. Buban's opinion. Dr. Buban based her conclusion that Plaintiff's condition improved in large part on Plaintiff's medication regime at the time of the 2004 hearing. When Dr. Buban offered her opinion in July 2004, it was not only just seven months after the proposed ending date of the closed period, but it was also prior to Plaintiff's second hospitalization in July 2005 for depression, suicidality, hearing voices, and feeling overwhelmed with anxiety. (Tr. 924-40). Plaintiff was admitted to the hospital in July of 2005 at which time her medications were changed, increased, and discontinued. (Tr. 924). She was discharged in stable condition; however even the hospital examiner commented on her new medication regime, stating that "this honeymoon period may not last for long." *Id.* A treatment note in October 2005 from Plaintiff's therapist stated: "rapid speech, some euphoria . . . consulted with Dr. Patwa. He recommends 1) cut out the Effexor 2) add Seroquel." (Tr. 976). The record shows that such mediation adjustments have continually been made, despite Dr. Buban's statement that medications were "stable" in late 2003.

Additionally, the report, interrogatories, and psychiatric review technique form completed by Dr. Patwa in December 2003, after the end of the proposed closed period, clearly indicate that Plaintiff would do well for brief periods of time but would continue to suffer from extended periods of depression, crying spells, hallucinations, and hypomania. (Tr. 411-28). The treatment notes offer substantial support for her ongoing instability – in fact Plaintiff noted that Dr. Patwa "works on my medications a lot. He

-16-

adjusts it a lot." (Tr. 1019).

Accordingly, the ALJ's reliance on Dr. Buban's testimony in determining that Plaintiff's impairment had improved ignores a plethora of evidence to the contrary. As detailed in the recitation of plaintiff's medical evidence, the vast majority of Plaintiff's medical treatment indicates repeated periods of decompensation. Plaintiff's extensive treatment for depression is thoroughly documented for the period December 1, 2003-October 17, 2007. In light of the evidence of record and the requirements of Social Security Ruling 96-7p, 1996 SSR LEXIS 4, the ALJ erred in finding that Plaintiff experienced a medical improvement as of December 1, 2003.

## B.

Next, the Plaintiff maintains that the ALJ erred by failing to grant proper weight to the opinion of her treating psychiatrist, Dr. Patwa. Dr. Patwa opined multiple times after December 1, 2003 that Plaintiff was unemployable due to her mental impairments. However, the ALJ found that there was a lack of clinical findings to support Dr. Patwa's limitations. Specifically, Plaintiff argues that the ALJ should have given controlling weight to the opinion of Dr. Patwa, and that the ALJ did not provide "good reasons" for giving Dr. Patwa's opinion "little weight." (Tr. 856).

A treating source is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527

(d)(2).[5]  When a medical source opinion is not entitled to controlling weight, an ALJ will

evaluate the factors in 20 C.F.R. § 404.1527(d) (length, nature, and extent of treatment

relationship; supportability; consistency; and specialization) when determining the weight

to give an opinion.

The ALJ has a duty to "always give good reasons in our notice of determination of

decision for the weight we give [a] treating source's opinion."  20 C.F.R. §

404.1527(d)(2).  Those good reasons must be "supported by the evidence in the case

record, and must be sufficiently specific to make clear to any subsequent reviewers the

weight the adjudicator gave to the treating source's medical opinion and the reasons for

that weight."  Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin.

July 2, 1996).  This Court has made clear that "[w]e do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating

physician's opinion and we will continue remanding when we encounter opinions from

ALJ's that do not comprehensively set forth the reasons for the weight assigned to a

treating physician's opinion."  *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009).

Here, the ALJ explained that "the rather grim functional assessments of Dr. Patwa

---

[5]     *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone.).

are poorly supported by clinical data or progress notes form his clinic," which generally showed "fair-to-good functioning." (Tr. 855). Accordingly, the ALJ found that the opinions of Plaintiff's treating psychiatrist, Dr. Patwa, spanning almost ten years, "must receive low marks." (Tr. 856). However, the ALJ fails to cite to specific progress notes that are inconsistent with Dr. Patwa's opinion regarding Plaintiff's emotional stability or reliability. Additionally, the indication that Plaintiff is functioning "fair-to-good" in a few progress notes out of dozens does not alone translate into Plaintiff being employable.

Dr. Patwa examined and treated Plaintiff for ten years, unlike the medical examiner, upon whom the ALJ substantially relies. In December 2003, Dr. Patwa stated that Plaintiff does well for brief periods but has extended periods of depression, crying spells, hallucinations, and hypomania to the point where she is not considered able to perform any substantial gainful employment. (Tr. 411). In Dr. Patwa's September 2008 assessment, he opined that "based on her clinical history and recent mental status exams, Mrs. McNeal is flighty and often tangential in her thinking." (Tr. 956). He also opined Plaintiff "exhibits behavioral extremes at times that would be disruptive in a work environment and would make it unlikely she could be relied upon to show up regularly and on time." (Tr. 957). He went on to note that "as observed during sessions and reported in her history, Mrs. McNeal often has racing thoughts and panic attacks that can affect her ability to concentrate, communicate appropriately or function consistently in an employment setting." (*Id.*)

The ALJ fails to provide good reasons to reject the opinion of the treating

physician.  The non-examining physicians' assessments do not constitute *substantial evidence* so as to overcome the findings of Dr. Patwa.  Therefore, the proof of disability is strong and opposing evidence is lacking in substance.

### III.

When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted.  The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987).

The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming.  *Faucher*, 17 F.3d at 176; *see also Felisky*, 35 F.3d at 1041; *Mowery v. Heckler*, 772 F.2d 966, 973 (6th Cir. 1985).  Such is the case here.

Here proof of disability <u>is</u> overwhelming and remand will serve no purpose other than delay.  As fully recited herein, in view of the extensive medical record of evidence of disability, and the credible and controlling findings and opinions of Dr. Patwa, the ALJ erred in finding that Plaintiff experienced a medical improvement such that she would be able to engage in substantial gainful activity; and proof of disability is overwhelming.

**IT IS THEREFORE ORDERED THAT:**

The decision of the Commissioner, that Plaintiff was not entitled to disability insurance benefits and supplemental security income beginning December 2, 2003- October 17, 2007, is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**, and it is **REVERSED**; and this matter is **REMANDED** to the ALJ for an immediate award of benefits; and, as no further matters remain pending for the Court's review, this case is to be **CLOSED,** upon entry of judgment by the Clerk**.**

Date:  March 7, 2012                                   *s/ Timothy S. Black*
                                                        Timothy S. Black
                                                        United States District  Judge